## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this
Memorandum Decision shall not be regarded as
precedent or cited before any court except for the
purpose of establishing the defense of res judicata,
collateral estoppel, or the law of the case.



FILED

Feb 20 2018, 6:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT N.F.

Dale W. Arnett
Winchester, Indiana

ATTORNEY FOR APPELLANT M.F.

J. Clayton Miller
Jordan Law, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination
of the Parent-Child Relationship
of:

C.F. and K.F. (Minor Children)

and

N.F. (Father) and M.F. (Mother),

*Appellants-Respondents,*

*v.*

The Indiana Department of Child
Services,

*Appellee-Petitioner.*

February 20, 2018

Court of Appeals Case No.
68A01-1709-JT-2077

Appeal from the Randolph Circuit
Court

The Honorable Jay T. Toney, Judge

Trial Court Cause Nos.
68C01-1701-JT-31
68C01-1701-JT-32

**Bradford, Judge.**

# Case Summary

[1] K.F. and C.F. (collectively, "the Children") were born in June of 2006 and June of 2007, respectively, to Appellants-Respondents N.F. ("Father") and M.F. ("Mother") (collectively, "Parents"). In August of 2015, after Appellee-Petitioner the Indiana Department of Child Services ("DCS") received reports of substance abuse and unstable housing, the Children were removed from Parents and eventually found to be children in need of services ("CHINS"). Parents were ordered, *inter alia*, to participate in several services, submit to drug screens, and secure stable housing and income. Parents, for the most part, did not comply with the juvenile court's orders, consistently testing positive for illegal drugs and failing to secure stable housing or income.

[2] In January of 2017, DCS petitioned the juvenile court to terminate Parents' rights in the Children. Following an evidentiary hearing held in May of 2017, the juvenile court ordered Parents' rights in the Children terminated. Mother contends that DCS presented insufficient evidence to establish that (1) the conditions leading to the removal of the Children would not be remedied, (2) continuation of the parent-child relationship posed a threat to the Children, and (3) termination was in the Children's best interests. Father contends that DCS failed to establish that it has a satisfactory plan for the care and treatment of the Children. Because we disagree, we affirm.

# Facts and Procedural History

[3] The Children were born in June of 2006 and June of 2007, respectively, to Parents. On August 5, 2015, DCS received a report "with allegations of substance abuse by both parents and lack of stable housing by both parents." Tr. p. 8. The same day, DCS family case manager Danielle Ankrom ("FCM Ankrom") went to the home. Father admitted to FCM Ankrom "he had been using heroin to cope with back pain from a previous injury." Tr. p. 9. DCS removed the Children after substantiating the allegations of Parents' drug use and lack of stable housing.

[4] On September 21, 2015, the juvenile court adjudicated the Children to be CHINS after Parents admitted they "have inadequate and unstable housing for" the Children, who need "care, treatment or rehabilitation that the child was not being received at the time of removal and is unlikely to be provided or accepted without the coercive intervention of the Court." DCS Ex. 5. At the October 22, 2015, dispositional hearing, Parents were ordered to (1) participate in and complete home-based counseling services, (2) complete a parenting assessment and a substance-abuse assessment, (3) not use or consume any illegal controlled substances and only take prescribed medications, (4) submit to drug screens, (5) obtain and maintain suitable housing, (6) provide a safe and stable home environment for the Children, and (7) attend all visits with the Children. Over the course of the CHINS cases, Parents attended nine child and family team meetings.

[5] Both Parents consistently tested positive for illegal substances throughout most of the CHINS and termination proceedings, specifically, for methamphetamine,

amphetamine, heroin, morphine, cocaine, THC, Xanax, Fentanyl, or combinations of these drugs. Father admitted at the termination hearing that he abused drugs, having "started out with a pain medication" after he had been prescribed morphine for back pain nine or ten years previously. Tr. p. 145. Father said the pain clinic closed and he "was introduced to heroin and that was the only thing that was helping [his] back at the time." Tr. p. 145. Father admitted to using "meth before too", but testified, "that's not a problem." Tr. p. 155.

[6] DCS referred Parents for substance-abuse assessments five times between August of 2015 and March of 2016. Father completed a Harbor Lights assessment in November of 2015 but did not follow the recommendations. Parents completed the assessment at Extra Special Parents in December 2015, which recommended completing a detoxification program and then a residential treatment plan. They did not follow these recommendations. Parents completed the second assessment at Harbor Lights in March of 2016, which again recommended detoxification and residential treatment. Parents completed the detoxification portion that same month but did not complete the residential program. Father did not begin the residential program because Mother was enrolled. Harbor Lights prefers that persons in a relationship not attend the same treatment program "because of fraternization rules and it's not a protocol that [it] has." Tr. p. 103. Mother was participating in residential treatment, but she left against medical advice when Father left after completing detoxification. Father never came back to start residential treatment after

Mother left. FCM Ankrom and court-appointed special advocate ("CASA") Debra McGriff-Tharp provided Parents with free community resources for substance-abuse support meetings, and provided them with attendance sheets. FCM Ankrom never received any sheets back.

[7] Parents did not have stable housing or steady employment during the CHINS case. Parents only "sporadically" reported to FCM Ankrom where they were living. Tr. p. 17. Parents had four different addresses and sometimes stayed with family, friends, or in hotels. Parents' lack of employment "has been an ongoing struggle throughout this case as well." Tr. p. 18. DCS referred Parents for case-management services on three occasions to assist with housing and employment. Parents cancelled most of their meetings with their home-based case manager. Parents did not accomplish their goals, and the service was closed in October of 2016.

[8] Thereafter, DCS referred Parents to Lifeline for case management. Although Parents were initially "engaged and motivated[,]" their engagement and level of participation diminished. Tr. p. 85. There "were a lot of cancellations and no-shows." Tr. p. 85. At times, Parents forgot or slept through appointments and did not attempt to reschedule. Services closed in February of 2017 after Parents missed three appointments in a row, not having completed their housing and employment goals. Mother was discharged from another provider in early March of 2017 because of "too many no shows." Tr. p. 22.

[9] Father testified he was incarcerated "maybe four or five times" during the CHINS case for "old charges[,]" including from April to August of 2016. Tr. p. 152. He was also arrested in December of 2016 and was released "a few weeks" before the March 15, 2017 termination factfinding hearing. Tr. p. 31. Father tested positive for illegal or unprescribed drugs, including Xanax, Buprenorphine, and cocaine after his release. Father admitted the Xanax and Buprenorphine were not prescribed. Father also tested positive for Tramadol, which Father said was for a hernia. FCM Ankrom "never saw that prescription." Tr. p. 32.

[10] Parents were ordered to participate in visitation with the Children. At the June of 2016 CHINS review hearing, DCS recommended Mother's visits transition to unsupervised visits. DCS did not make a similar recommendation for Father because he was incarcerated. Mother participated in these unsupervised visits until she relapsed in August of 2016, testing positive for cocaine. Mother provided ten clean drug screens after her relapse, and at the September of 2016 review hearing, the juvenile court ordered unsupervised visits for Parents. Parents had some unsupervised visits but relapsed on October 5, 2016, both testing positive for morphine, with Father also testing positive for heroin. Parents have continued to fail drug screens and visits have remained supervised.

[11] DCS initiated the termination proceedings on January 27, 2017. A week prior to the start of the termination hearing on March 15, 2017, Parents informed FCM Ankrom they had obtained a one-bedroom apartment—the first residence they had on their own since DCS became involved. Parents "planned to get a

job" to pay their month-to-month lease. Tr. p. 18. FCM Ankrom was concerned because employment had been an issue throughout the case and Parents were unemployed.

[12] Mother testified that she had applied at a temporary employment agency the day before the last day of the termination evidentiary hearing and was waiting to hear back. She said she was "in the process" of paying the rent for May of 2017, which had been due for three days. Tr. p. 130. Mother said that she had spoken with the landlord, who had given her more time to pay. When questioned by the juvenile court what she meant by "in the process[,]" Mother answered that she was "getting help until I get a job." Tr. p. 130. Mother was relying on receiving money from the local trustee and indicated that she would be seeking assistance from two churches the next day.

[13] Mother testified that she had last used drugs two weeks prior to the May of 2017 termination factfinding hearing when she took unprescribed Ativan that she obtained from a friend. Mother testified she had taken "a few Ativan" in the two months before the May 10, 2017 termination hearing. Tr. p. 139. Mother's drug screens in March of 2017 were positive for THC and Xanax (March 1); THC (March 6); and THC, heroin, and Ativan (March 8). On the day of the May 10, 2017 termination hearing, Father was incarcerated on charges of misdemeanor theft. Moreover, Father was on probation imposed in another case and faced the possibility of a six-month sentence. Before Father was incarcerated, he had tested positive in March of 2017 for cocaine as well as unprescribed Xanax and Buprenorphine.

[14] As for the Children's situation as of the termination hearing, they were nine-and ten-years-old, had been removed for seventeen months, and had never been returned to their Parents' care because of Parents' "[o]ngoing issues with substance abuse and chronic homelessness." Tr. pp. 20–21. The Children were placed with their maternal aunt. Although FCM Ankrom described the Children having a "strong relationship" with Parents, this strong relationship made "everything that is happening right now [] very difficult on children" because they have "vocalized that they know that their parents need help." Tr. p. 22. The Children "understand what's going on. They—they understand that [their] parents are addicts." Tr. p. 27. FCM Ankrom did not believe that the reasons for the Children's removals were "likely to be fixed" because

> We continue to receive positive drug screens from [Father] and [Mother] and I'm very concerned that although they have a one-bedroom apartment at this time, with it being a month-to-month, uh, situation, I—I don't know that they can maintain it, due to them not being able to keep employment this entire time as well.

Tr. p. 21.

[15] FCM Ankrom did not believe that Parents would remedy the conditions that resulted in the Children's placement outside the home, testifying that "we are seventeen months into this case and the Department and CASA and the other supports that we have teamed with, have provided [Parents] with several different resources, and we're still in the same spot we were at the time of removal." Tr. p. 26. FCM Ankrom testified that, even if Parents obtained employment that could "potentially alleviate" their housing issues, "they're

continuing to test positive on their drug screens, so that does not alleviate the substance abuse issues." Tr. p. 24.

[16] FCM Ankrom also believed that the continuation of Parents' relationship posed a threat to the Children's well-being because "parents have been unable to provide any kind of stability, whatsoever, for the children, in the last seventeen months, and that's what the children desperately need at this point, is just some kind of normalcy." Tr. p. 22. FCM Ankrom believed that if the juvenile court granted termination the Children "will struggle, but [she] strongly believe that they'll adapt." Tr. p. 22. Parents' continued relationship posed a threat because the Children are "still young enough to where they need their parents to ensure their safety, and their parents are unable to do that under the influence." Tr. p. 27. FCM Ankrom testified termination was in the Children's best interests "[b]ecause the children have been going through this for the past seventeen months. In their minds, their parents are choosing drugs over them" and this is "detrimental to their mental health." Tr. p. 28.

[17] CASA Debra McGriff-Tharp was familiar with the Children and Parents. CASA McGriff-Tharp's concerns with the case included Parents' failure to maintain sobriety, Parents' inability to maintain long-term stable housing, Parents' inability to provide for the Children's needs, Parents' lack of progress, Parents' lack of employment, and the Children's need to be in a stable environment. CASA McGriff-Tharp recommended termination as the "best option at this point." Tr. p. 113. When asked if the current continuation of the

parent-child relationship poses a threat to the Children's well-being, she testified,

> No, the visitation goes great. I'm not talking about visitations, I'm talking about what happens after a two-hour visit, what happens when it's time for someone to go find a job or to feed the kids, or whatever. I—I know, myself, I've taken food to visits for them, just so that they had—because the parents hadn't eaten for two or three days, so those are the things that pile up that I'm concerned about, is that they can't take care of themselves, so being able to take care of the minimal needs that these children have, that's what my concern is.

Tr. p. 115–16. CASA McGriff-Tharp opined that Parents would not remedy their issues even if given more time.

[18] DCS's plan for the Children if the juvenile court granted termination is for the Children "to be adopted by a foster family." Tr. p. 21. DCS was searching for an adoptive family because the Children's aunt was not willing to be "a permanent placement." Tr. p. 24. The aunt was willing to care for the Children until Parents got "their act together. Um, now that she feels as though they're not going to get their act together, this is when she's vocalizing that she's not able to do this anymore." Tr. p. 35.

[19] On August 8, 2017, the juvenile court ordered the termination of Parents' rights in the Children, issued, *inter alia*, the following findings and conclusions in each of the Children's cases:

47. Mother has not made any progress during the pendency of the underlying CHINS case.

48. Father has not made any progress during the pendency of the underlying CHINS case.

49. There is a reasonable probability that the conditions that resulted in [Children's] removal and/or continued placement outside the home will not be remedied.

50. There is a reasonable probability that the continuation of the parent/child relationship poses a threat to the well-being of [the Children].

51. Termination of the parent/child relationships is in the best interest of [the Children].

52. The Department of Child Services has a satisfactory plan for the care and treatment of [the Children], which includes adoption.

Mother's App. pp. 68, 153.

# Discussion and Decision

[20] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's

interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[21] The purpose of terminating parental rights is not to punish the parent but to protect the children. *Id.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[22] Mother and Father both contend that the evidence presented during the evidentiary hearing was insufficient to support the juvenile court's order terminating Parents' parental rights to the Children. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[23] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child

relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[24] In order to involuntarily terminate Parents' parental rights in the Children, DCS must establish by clear and convincing evidence that:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> ….
>
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> …
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[25] Mother contends that DCS presented insufficient evidence to establish that (1) the conditions leading to the removal of the Children would not be remedied,

(2) continuation of the parent-child relationship posed a threat to the Children, and (3) termination was in the Children's best interests. Father contends that DCS failed to establish that it has a satisfactory plan for the care and treatment of the Children.

# I. Reasonable Probability that the Conditions Resulting in Continued Removal Would Not be Remedied

[26] Mother contends that the record does not establish that the reasons for the Children's continued removal would not be remedied.

> In determining whether "the conditions that resulted in the child's removal … will not be remedied," *id.*, we "engage in a two-step analysis," [*K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1231 (Ind. Ct. App. 2013)]. First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting [*In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)]) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," [*Bester*, 839 N.E.2d at 152]—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *See K.T.K.*, at 1234. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642–43 (Ind. 2014) (footnote omitted).

[27] The Children were removed following reports of Parents' substance abuse and inability to provide stable housing, and there is little reason to believe that those conditions have changed, or will change. The evidence of Parents' history of drug abuse, failure to find suitable employment or housing, and general noncompliance with services has already been detailed. To summarize, all attempts to provide Parents with assistance have ended in failure.

[28] Considering this history, FCM Ankrom opined that Parents would not remedy the conditions that resulted in the Children's placement outside the home, noting that "we are seventeen months into this case and the Department and CASA and the other supports that we have teamed with, have provided [Parents] with several different resources, and we're still in the same spot we were at the time of removal." Tr. p. 26. CASA McGriff-Tharp agreed, opining that Parents would not remedy their issues even if given more time. These evaluations, and the juvenile court's conclusion on this point, are amply supported by the evidence.

[29] Mother argues that the record establishes that she and Father had obtained stable housing as of the final termination hearing in May of 2017. Evidence at the hearing indicated, however, that Parents had only been in the apartment since March of 2017, they were there on a month-to-month basis, and Mother testified that she did not have the means to pay the rent for the month of May. Considering this, we cannot say that the juvenile court erred in refusing to

conclude that Parents had obtained stable housing. Mother's argument is an invitation to reweigh the evidence, which we will not do. *See In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d at 879.

## II. Parent-Child Relationship Posed a Threat to Child

[30] Mother also contends that the juvenile court erred in concluding that the continued parent-child relationship posed a threat to the Children. Because we have already concluded that the juvenile court did not err in concluding that the conditions that led to the Children's removal would not likely be remedied, we need not address Mother's argument in this regard. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing that DCS must establish that *one* of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services").

## III. Children's Best Interests

[31] Finally, Mother contends that insufficient evidence supports the juvenile court's conclusion that termination is in the Children's best interests. We are mindful that in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the

totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992).

[32] As mentioned, FCM Ankrom testified termination was in the Children's best interests "[b]ecause the children have been going through this for the past seventeen months. In their minds, their parents are choosing drugs over them" and this is "detrimental to their mental health." Tr. p. 28. CASA McGriff-Tharp agreed that termination was the "best option at this point" in order to provide the Children with the stable environment they need. Tr. p. 113. Although this evidence alone is likely sufficient to sustain the juvenile court's finding that termination is in the Children's best interests, *see, e.g.*, *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (concluding that testimony of GAL and FCM was sufficient to sustain finding that termination was in the child's best interests), there is more. As already detailed, there is little reason to believe that Parents' substance-abuse issues will be addressed any time soon—if at all—nor will their inability to secure stable housing or employment. Mother draws our attention to Parents' generally good record when it came to visitation with the Children and the undisputed fact that Parents and the Children love each other. Regardless, however, Parents are not able to appropriately provide for the

Children or keep them safe. Under the circumstances, we cannot say that Mother has established error in this regard.

## IV. Satisfactory Plan for Child's Care and Treatment

[33] Finally, Father contends that the juvenile court's conclusion that DCS has a satisfactory plan for the placement of the Children is unsupported by the record. DCS's plan for the Children if the juvenile court granted termination is for them "to be adopted by a foster family." Tr. p. 21. "For a plan to be 'satisfactory,' for purposes of the statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007) (quoting *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*), *trans. denied*. DCS's plan for eventual adoption by a foster family easily satisfies this test. Indeed, although it seems that the Children's current placement cannot become permanent, "(a)ttempting to find suitable parents to adopt [Child] is clearly a satisfactory plan." *Id.* at 375 (citing *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). Father has failed to establish error in this regard.

[34] The judgment of the juvenile court is affirmed.

Robb, J., and Crone, J., concur.